UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ERNEST F., | : |
|     Petitioner, | : Civ. No. 21-3700 (KM) |
| v. | : |
| MICHAEL RUSSO, in his official capacity as Warden of the Bergen County Jail, et al. | : OPINION |
|     Respondents. | : |

**KEVIN MCNULTY, U.S.D.J.**

I.  **INTRODUCTION**

Petitioner Ernest F.[1] is a Haitian citizen formerly held pursuant to a final order of removal at the Bergen County Jail, but now held at the Glades County Detention Center in Moore Haven, Florida.[2] Through counsel, he filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 seeking release from custody, arguing that his removal was no longer significantly likely in the reasonably foreseeable future. (DE 1 ("Petition").) Respondents (the "Government") opposed (DE 3), and Petitioner replied (DE 4). As detailed below, the parties submitted further briefing (DE 5, 7, 8, 9, 11, 12, 14, 16). Pursuant to Local Civil Rule 78.1, I decide this matter without oral argument, and I will grant the Petition to the extent of ordering an individualized bond determination.

II.  **BACKGROUND**

a.  **Underlying Circumstances and Procedural History**

Petitioner is a Haitian citizen and national who entered the United States as a lawful permanent resident in 1988, when he was about 13, and grew up in New Jersey. (DE 3-1;

---

[1] Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified only by his first name and last initial.

[2] At the time of filing, Petitioner was detained at the Bergen County Jail. The parties do not dispute that this Court retains jurisdiction to adjudicate the pending petition. *See Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004). I take this as a concession by the government that it will submit to the Court's jurisdiction to award the requested relief, should the government's position not prevail.

Petition ¶ 20.) Currently in his forties, he has four children, all of them born in New Jersey. (*Id.*) In May 2002, Petitioner was convicted of reckless manslaughter and unlawful possession of a handgun. (*Id.* at ¶ 21.) Petitioner served over 18 years in prison (*Id.*) Upon his release on September 1, 2017, Immigrations and Customs Enforcement (ICE) arrested Petitioner and detained him at the Essex County Correctional Facility. (*Id* at ¶ 22.) The Department of Homeland Security (DHS) issued Respondent a Notice to Appear (NTA). (*Id.* at ¶ 23; DE 3-1). The NTA alleged, in substance, that Petitioner was removable pursuant to Immigration and National Act (INA) § 237 on the basis of drug and firearm-related convictions. (*Id.*)

Petitioner applied pro se for asylum, withholding of removal, and protection under the United Nations Convention Against Torture (CAT). (Petition at § 25.) Although he appeared with counsel several times at immigration court proceedings, he ultimately appeared pro se at his individual merits hearing. (*Id.*) Petitioner testified that he feared returning to Haiti because he would be associated with his stepfather, a member of the Tonton Macoute, a militia associated with now-reviled former President Jean-Claude Duvalier. (*Id.* at ¶ 26.) Petitioner also testified that his stepfather physically, sexually, and psychologically abused him as a child. (*Id.*)

In a December 12, 2018 written decision, the Immigration Judge (IJ) denied Petitioner's requests for relief and ordered him removed. (*Id.* at ¶ 27; DE 1-3 ("IJ Decision").) The IJ held that Petitioner's conviction was for an aggravated felony and particularly serious crime, rendering Petitioner statutorily ineligible for asylum and withholding of removal. (*Id.*). The IJ also held that Petitioner failed to meet his burden of proof; specifically, the IJ found Petitioner's testimony to be incredible and uncorroborated. (*Id.*) The Board of Immigration Appeals (BIA) affirmed the IJ's decision. (DE 3-3.)

On July 1, 2019, Petitioner filed with the Third Circuit a pro se petition for review of the BIA's affirmance and request for a stay of removal. (DE 1-5.) The Third Circuit entered a temporary stay, followed by a stay pending the outcome of the petition. (DE 1-6.) On August 13, 2020, Petitioner, through counsel, filed a motion to reopen with the BIA, relying on *Rosa v. Attorney General*, 950 F.3d 67 (3d Cir. 2020), to argue that Petitioner was now eligible for cancellation of removal. (Petition at ¶ 30.) When this habeas petition was filed, that motion to reopen was still pending. (*Id.*)

On October 18, 2019, I granted Petitioner's prior habeas petition and directed that the immigration court conduct a bond hearing. (Docket No. 19-cv-10189.) On November 7, 2019,

the IJ held that hearing, found that DHS did not establish that Petitioner continues to be a danger to the community or flight risk, and ordered Petitioner released on bond. (DE 3-4 at ¶ 12.) On March 24, 2020, the BIA reversed. (DE 1-15.) The BIA found, as relevant here, that DHS met its burden of establishing, by clear and convincing evidence, that Petitioner remained a danger to the community based on his 2004 convictions, which "are very serious and indicative of dangerous behavior." (*Id.* at 3.) The BIA noted that Petitioner's "lack of violent behavior or completion of classes and courses while institutionalized [does] not significantly support a conclusion that he poses no danger upon release." (*Id.*).[3]

On August 24, 2020, the Third Circuit granted the parties' joint request to dismiss the then-pending petition for review and vacate the stay of removal. (*Id.* at ¶ 31.) The Government agreed not remove Petitioner while the motion to reopen remained pending.[4] (*Id.*) As of this Petition's filing, Petitioner was detained pursuant to the post-removal custody statute, 8 U.S.C. § 1231(a) for 191 days as of this Petition's filing. (*Id.* at ¶ 32.) According to Petitioner, despite his cooperation with ICE, ICE has been unable to secure travel documents to effectuate Petitioner's removal. (*Id.* at ¶ 33-35.) Based on this delay, and claiming he had various medical conditions placing him at increased risk of developing severe complications due to Covid-19, Petitioner administratively sought release on at least three occasions. The ICE denied all three requests. (*Id.* at ¶¶ 35-37; DEs 1-17-1-23.)

After initial briefing, Petitioner moved for immediate release, arguing, in substance, that the Government's opposition demonstrated that Petitioner's removal is not reasonably foreseeable. (DE 5.) The Government responded with a new declaration containing updates on actions taken to effect Petitioner's removal. (DE 7.) On the same day, Petitioner moved before the U.S. Court of Appeals for the Third Circuit for a stay of removal. (DE 9-1.)

Days later, on June 17, 2021, the Third Circuit administratively granted the stay until the motion for a stay of removal could be considered. (DE 8-1.) Based on the stay, the Government initially argued that Petitioner's status reverted from 8 U.S.C. § 1231(a)(6) post-final order detention to 8 U.S.C. § 1226(c) pre-final order detention. (DE 8.) In subsequent briefing,

---

[3] This is questionable reasoning. Given that he has been incarcerated for about 20 years, Petitioner's only means of demonstrating whether he poses a danger to the community upon release is his behavior while incarcerated.

[4] The parties agree that after this Petition was filed, on April 23, 2021, the BIA denied Petitioner's motion to reopen. (DE 3 at 1; DE 4 at 4, n. 6)

3

Petitioner disputed this characterization of his status. (DE 9.) The Government ultimately agreed and withdrew its 1226/1231 mootness argument, relying in part upon the Supreme Court's recent decision in *Johnson v. Guzman Chavez*, 141 S. Ct. 2271 (2021) (DE 11.) The Government nevertheless maintained its earlier argument on the remaining issue: that Petitioner's removal is reasonably foreseeable. (*Id.* at 2.) Petitioner thereafter submitted a final reply reiterating his disagreement with that argument. (DE 14.)

As of the filing of this Opinion, merits briefing in the Third Circuit case is not complete. On September 16, 2021, Petitioner requested an extension of time to file his reply brief. (*See* Third Circuit Docket No. 21-1887, DE 27.)

**b.    ICE's Efforts to Deport Petitioner**

In support of its argument that Petitioner's removal is reasonably foreseeable, the Government submitted two declarations by ICE Deportation Officer Charles Hester, one attached to the Government's April 26, 2021 initial response and an updated declaration on June 17, 2021 (DEs 3-4 and 7-1, the "1st Hester Decl." and "2d Hester Decl."). According to Hester, despite the pandemic, over 200 removals to Haiti were completed as of late April, 2021. (1st Hester Decl. ¶ 35.)

Hester's declarations detail quite substantial efforts to effectuate Petitioner's removal. According to Hester, ICE first applied for a travel document through ICE headquarters on June 3, 2019. That request was routed to the Consulate General of Haiti in New York. (*Id.* at ¶ 9.) On June 28, 2019, ICE called the Haitian Consulate to follow up. (*Id.* at ¶ 10.) On March 5, 2020, ICE requested Petitioner's birth certificate from the Haitian Consulate. (*Id.* at ¶ 13.) On August 24, 2020, ICE requested an interview with the Haitian Consulate in New York. (*Id.* at ¶ 17.) On August 27, 2020, ICE followed up by email. (*Id.* at 18.) Receiving no response, ICE, through its HQ Removal International Operations (RIO), learned on September 3, 2020, from the Haitian government that Petitioner's identity could not be verified without a valid Haitian identification. (*Id.* at ¶¶ 19-20.)  Follow-up calls on October 9 and 14, 2020, went unanswered and were met with a message that the voicemail mailbox was full. (*Id.* at ¶ 21.)

ICE then involved Petitioner more directly. On October 20, 2020, ICE requested identifying documents from Petitioner. (*Id.* at  22.) ICE also involved its Foreign Service National Investigator (FSNI) (*Id.* at ¶ 23.) On November 9, 2020, ICE transferred Petitioner to Krome Service Processing Center in Miami, Florida ("Krome") to attempt to have Petitioner

interviewed by the Haitian Consulate in Miami. (*Id.* at ¶ 25.) After the Consulate declined, ICE transferred Petitioner to Bergen County Correctional Facility on January 8, 2021. (*Id.* at ¶¶ 26-27.)

ICE continued its efforts, including submitting a travel document nomination packet for the Haiti National Archives and requesting help from an Assistant Attaché for Removal in Haiti. (*Id.* at ¶¶ 28-30.) On March 18, 2021, Petitioner stated that his sister might have information about Petitioner's citizenship, but she was unable to provide any such information. (*Id.* at ¶ 31.) On April 2, 2021, Petitioner submitted a second travel document nomination packet to the Haiti Archives for a copy of Petitioner's birth certificate. (*Id.* at ¶ 32.)

On June 17, 2021, on the same day the Third Circuit granted an administrative stay of removal, Hester provided an update on ICE's continuing efforts to deport Petitioner. On May 5, 2021, the Assistant Attaché reported that he could not obtain Petitioner's birth certificate after two trips to the Haitian National Archives, but did obtain an old passport number. (2d Hester Decl. at ¶ 37.) On June 11, 2021, the Haitian Consul for Miami agreed to interview Petitioner via FaceTime on the condition that Petitioner be present in the Miami jurisdictional area. (*Id.* at ¶ 38.) On June 14, 2021, ICE again flew Petitioner to Krome in Miami. (*Id.* at ¶ 39.) After a postponement, the Haitian Consul interviewed Petitioner and informed ICE that they would issue a travel document. (*Id.* at ¶ 41.) Based on these developments, ICE tentatively scheduled removal on July 6, 2021.[5] (*Id.* at ¶ 43.)

### III.   ANALYSIS

The parties agree that the only remaining issue is whether Petitioner's removal is reasonably foreseeable. Limiting discussion to that issue, I must find in Petitioner's favor.

Once a final removal order is issued, detainees are held pursuant to 8 U.S.C. § 1231(a)(2), which states the Attorney General *shall* detain an alien during the 90–day removal period following a final order of removal and *may* thereafter continue to detain an individual removable under § 1227(a)(2) if the Attorney General determines the alien is a risk to the community. 8 U.S.C. § 1231(a)(6). The constitutionality of this post-removal period of detention is governed by *Zadvydas v. Davis*, 533 U.S. 678 (2001), which narrowed the scope of permissible detention under § 1231(a)(6).

---

[5]   It is unclear whether ICE ultimately received those travel documents.

In *Zadvydas,* the Supreme Court expressed its disapproval of indefinite immigration detention. *Id.* The Court "found nothing in the history of [the INA] that clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention." Consequently, finding that Congress previously doubted the constitutionality of detention for more than six months, the Court further held that "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701.

The Supreme Court "did not, however, provide that the…limiting construction of § 1231(a)(6) is the sole constraint on detention that the Due Process Clause requires." *Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d 208, 221 (3d Cir. 2018). "To the contrary, *Zadvydas* provides that, even where detention is not indefinite, it still must bear a 'reasonable relation' to the Government's interests in preventing flight and danger to the community and be accompanied by adequate procedures to determine if detention is necessary. *Id.* at fn 10 (citing *Zadvydas,* 533 U.S. at 690 ("[I]f removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period.")).

Accordingly, "[w]hile *Zadvydas* limited the *substantive scope* of § 1231(a)(6), it did not explicitly preclude courts from construing § 1231(a)(6) to include additional *procedural* protections during the statutorily authorized detention period, should those protections be necessary to avoid detention that could raise different constitutional concerns." *Guerrero-Sanchez*, 905 F.3d at 221 (citing *Diouf v. Napolitano*, 634 F.3d 1081, 1084 (9th Cir.2011)). The Third Circuit found "no substantial distinction" between the liberty interests of aliens detained under § 1226(a) and § 1231(a)(6), because "regardless of the stage of the proceedings, the same important interest is at stake—freedom from prolonged detention." *Guerrero-Sanchez*, 905 F.3d at 222-23. Thus, the Third Circuit joined the Ninth in holding that "an alien facing prolonged detention under [§ 1231(a)(6)] is entitled to a bond hearing before an immigration judge and is entitled to be released from detention unless the government establishes that the alien poses a risk of flight or a danger to the community." *Id.* at 224 (citing *Diouf*, 634 F.3d at 1092). "Under § 1231(a)(6), [w]hen detention crosses the six-month threshold and release or removal is not imminent, the private interests at stake are profound and the risk of an erroneous deprivation of

liberty in the absence of a hearing before a neutral decisionmaker is substantial." *Guerrero-Sanchez*, 905 F.3d at 225.

Petitioner's removal order became administratively final on May 21, 2019, when the BIA affirmed the IJ's denial of relief. 8 U.S.C. § 1101(a)(47)(B)(i) (providing that a removal order becomes final upon "a determination by the Board of Immigration Appeals affirming such order"); 8 C.F.R. § 1241.1(a) ("An order of removal . . . shall become final . . . [u]pon dismissal of an appeal by the Board of Immigration Appeals.").[6]

Throughout its opposition papers, the Government maintains that there is a significant likelihood of removal in the reasonably foreseeable future, focusing largely on the Government's efforts to obtain Petitioner's travel documents. The Government argues that the only impediment to Petitioner's removal is a temporary administrative stay, in the process seeking to distinguish these circumstances from a situation in which removal is unlikely because the destination country refuses or intends to refuse to accept a petitioner or issue travel documents. As a coordinate court has held, however, "prolonged incarceration for an alien whose potentially meritorious challenge to removal is part of a congested docket is indistinguishable from lengthy incarceration because the alien's native country refuses to issue travel documents." *Oyedeji v. Ashcroft*, 332 F. Supp. 2d 747, 753 (M.D. Pa. 2004). There is no functional distinction; in either situation, removal is not foreseeable, through no fault of the petitioner.

Moreover, while some courts have concluded that seeking judicial review of removal orders "acts to prevent" removal, most courts have held that utilizing available judicial processes, at least if done in good faith, does not extend the removal period. *Compare German Santos v. Warden Pike Cty. Corr. Facility*, 965 F.3d 203, 211 (3d Cir. 2020) (finding that holding good-faith challenges against a petitioner would "effectively punish…pursuing applicable legal remedies.") with *Bini v. Aljets*, 36 Fed. App'x 868, 869 (8th Cir. 2002) (petitioner's removal period was extended under Section 1231(a)(1)(C) by his obtaining a stay). Petitioner offers a persuasive comparison to the ten-month adjudication of his prior motion for a

---

[6] As Petitioner notes, however, the Third Circuit's stay of removal did delay commencement of the "removal period" described in 8 U.S.C. § 1231(a)(1)(A) until August 24, 2020, when the Third Circuit dismissed the petition for review of the BIA's decision. But using either date, Petitioner may challenge his detention as prolonged, because over six months have elapsed either way.

7

stay of removal; if the current proceedings proceed on a similar timeline, they could extend well beyond the "reasonably foreseeable future." (DE 14-1, citing DE 9-2.)

As Petitioner further argues, there is no indication—and indeed no allegation from the Government—of bad faith by Petitioner, such as providing false or inconsistent information or refusing to complete requisite travel documents. *See, e.g., Lema v. INS*, 341 F.3d 853, 856 (9th Cir.2003) (alien refused to "cooperate fully and honestly with officials to secure travel documents"); *Pelich v. INS*, 329 F.3d 1057, 1059 (9th Cir.2003) (alien refused to fill out passport application)); *Farez-Espinoza v. Chertoff*, 600 F. Supp. 2d 488, 501 (S.D.N.Y. 2009) (collecting cases where petitioner hampered agency efforts or refused to cooperate).

The Government's documented (and undisputed) pursuit of Petitioner's travel documents has indeed been more than diligent. But importantly, as of the Government's most recent submission on June 30, 2021—days before Petitioner was originally scheduled to be removed to Haiti—the Government had received a positive response, but there is no indication that the Government had actually received travel documents from Haiti. The course of events thus far has not inspired confidence that the travel documents will arrive speedily. This delay, coupled with the pending appeal, suggest that Petitioner's removal, if it happens at all, is months away at the earliest; *cf Beckford v. Lynch*, 168 F. Supp. 3d 533 (W.D. N.Y. 2016) (petitioner not entitled to relief where he relied solely on the fact that his detention has exceeded the presumptively reasonable six-month period, request for travel document for alien remained pending with Consulate, nothing indicated that Jamaican authorities were inclined to deny request, DHS had successfully repatriated significant number of aliens to Jamaica in recent years).

Furthermore, as Petitioner argues, the Supreme Court has held that the "choice . . . is not between imprisonment and . . . 'living at large.' It is between imprisonment and supervision under release conditions that may not be violated." *Zadvydas,* 533 U.S. at 696. The Government has not even argued that Petitioner is a flight risk, or that supervised release would be insufficient to secure his presence on a future date.[7]

---

[7]   I will not factor in the conditions at Bergen County Jail, because Petitioner is no longer confined there. I have not information before me regarding conditions at the Florida facility where Petitioner is detained. For what it is worth, I note that the Covid-19 pandemic persists in Florida. *See Palm Beach Post,* "50,000 Floridians killed by Covid-19, taking only one month since 40,000 died," September 19, 2021, < https://www.msn.com/en-us/health/medical/50000-floridians-killed-by-covid-19-taking-only-one-month-since-40000-died/ar-AAOwAzj >. Because I am requiring a bond hearing, I need not decide whether COVID conditions would

Accordingly, given the length of Petitioner's confinement without a hearing and the low likelihood that Petitioner will be removed to Haiti in the reasonably foreseeable future, I direct that the Government conduct a bond hearing within 14 days.

## IV.     CONCLUSION

For the above reasons, the Petition will be GRANTED to the extent that I will direct that an immigration judge conduct an individualized bond hearing within fourteen days. An appropriate order follows.

Dated: September 24, 2021

/s/ Kevin McNulty

_____
KEVIN MCNULTY
United States District Judge

---

independently require such a hearing as a matter of due process. *See Guerrero-Sanchez*, 905 F.3d at 211. The Immigration Judge is free to consider any and all relevant factors in connection with Petitioner's application for release on bond.